UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATSY BORUM,

       Plaintiff,                               Case No. 13-cv-12421
                                             Hon. Matthew F. Leitman

v.

ILLINOIS CENTRAL RAILROAD, CO., et al.

       Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF #16)

## INTRODUCTION

On or about January 10, 2012, Plaintiff Patsy Borum ("Borum") was told by her supervisor at Defendant Illinois Central Railroad, Co. ("Illinois Central") that her job was being eliminated. Two or three days later, Borum's supervisor told her that the company had reversed its decision and she would retain her job. Nonetheless, Borum filed the instant action against Illinois Central and her supervisor, Colin G. McKelvie ("McKelvie," and together with Illinois Central, the "Defendants"). Borum alleges that Defendants discriminated and retaliated against her based on her race in violation of Michigan law. Defendants have moved for summary judgment (ECF #16). For the reasons explained below, the Court **GRANTS** Defendants' Motion.

## FACTUAL BACKGROUND

**A.    The Parties**

**1.    Illinois Central**

Illinois Central is a "rail carrier with operations throughout portions of the United States."   (McKelvie Declaration, ECF #17 at ¶3.)   Illinois Central is indirectly wholly-owned by Canadian National Railway Company ("Canadian National").   (*See* Rule 7.1 Corporate Disclosure, ECF #7.)

**2.    Borum**

Borum is an African-American woman who has worked for Illinois Central (or one of its predecessors) since 1974.   (*See* Borum Deposition, ECF #23-1 at 53, Pg. ID 242; *id.* at 124, Pg. ID 259.)   Her current job title is Manager of Commercial Motor Vehicles.   (*See id.* at 11, Pg. ID 231.)   In that role, Borum is responsible for managing all commercial motor vehicle "driver regulatory activity for Canadian National or for Illinois Central in the [United States]."   (McKelvie Dep., ECF #23-2 at 12, Pg. ID 285.   *See also* McKelvie Errata Sheet, ECF #24-2 at 1, Pg. ID 312.)   Borum supervises three Illinois Central employees (*see* Borum Dep., ECF #23-1 at 28, Pg. ID 235), and she reports to McKelvie (*see id*. at 39, Pg. ID 238).   Borum is based out of Illinois Central's office in Troy, Michigan.   (*See* McKelvie Decl. at ¶3.)

2

### 3.    McKelvie

McKelvie is the Manager of Fleet Engineering and Regulatory Assurance for Canadian National.  (*See* McKelvie Decl. at ¶2; McKelvie Dep. at 9, Pg. ID 285.)  McKelvie is responsible for "driver regulatory activity" and the replacement of Canadian National's vehicle fleet.  (McKelvie Dep. at 10, Pg. ID 285.)  He has been Borum's supervisor since 2010.  (McKelvie Decl. at ¶2.)  McKelvie reports to Mark Zunti ("Zunti"), the Director of Fleet Management.  (*See* McKelvie Dep. at 18, Pg. ID 287; Zunti Decl., ECF #18 at ¶2.)

## B.    Borum Files, and Later Settles, a Racial Discrimination Lawsuit Against a Predecessor of Illinois Central

In 1999, Borum received a job promotion from her then-employer, Grand Trunk Western Railroad ("Grand Trunk"), a predecessor company of Illinois Central.  (*See* Borum Dep. at 6, Pg. ID 230.)  Soon thereafter, the supervisor who awarded Borum the promotion left Grand Trunk, and Borum's new supervisor eliminated the position to which Borum had been promoted.  (*See id*. at 10, Pg. ID 231.)  After her promotion was rescinded, Borum filed a race discrimination lawsuit against Grand Trunk (the "1999 Lawsuit").  (*See id.* at 9-10, Pg. ID 231.)  Borum and Grand Trunk ultimately entered a settlement agreement to resolve the 1999 Lawsuit (the "Settlement Agreement").  (*See id.* at 11, Pg. ID 231.)

**C.**      **In 2011, Borum Complains to Human Resources About Alleged Discrimination Against Her Co-Workers**

For the next 12 years, Borum continued to work for Grand Trunk (which, at some point, became Illinois Central) in her position as Manager of Commercial Motor Vehicles.   In November 2011, Borum filed a complaint with the Illinois Central Human Resources department alleging that two co-workers had been racially discriminated against because they had been denied promotions (the "November 2011 Email").   (*See* Borum Dep. at 81, Pg. ID 249; Duane Spears Decl., ECF #20 at ¶3.)   The Human Resources department investigated Borum's complaint and, on December 8, 2011, informed Borum that "the investigation was complete and that [Illinois Central] was unable to conclude that there was a violation" of the company's anti-discrimination policy.   (Duane Spears Decl. at ¶3.)

**D.**      **Illinois Central Decides to Eliminate Borum's Position But Shortly Thereafter Reverses its Decision**

      **1.**      **Zunti And McKelvie Decide to Eliminate Borum's Position as Part of Department-Wide "Streamlining"**

In "late 2011," Zunti "examined job duties of individuals in [his] department to determine whether it would be possible to streamline positions and create operating efficiencies."   (Zunti Decl. at ¶3.)   As part of this evaluation, Zunti compared the job functions performed by Borum and another of Zunti's indirect reports – Colleen Cameron ("Cameron").   Cameron – who is white (*see* McKelvie

4

Dep. at 30, Pg. ID 290) – is a Fleet Regulatory Officer for Canadian National (*see* McKelvie Decl. at ¶7; Zunti Decl. at ¶4).  Cameron is located in Edmonton, Alberta, Canada, and she reports to McKelvie.  (*See* McKelvie Decl. at ¶7.)

Zunti determined that Borum and Cameron performed "similar[] but … not identical" job functions.  (Zunti Decl. at ¶3.)  Accordingly, Zunti concluded that Illinois Central and Canadian National "could better use [its] resources by eliminating … Borum's position and having … Cameron take over the majority of … Borum's job responsibilities."  (*Id.*)  Zunti asserts that his decision to eliminate Borum's position, rather than Cameron's, "was based on multiple business reasons."  (*Id.*)  For instance, Cameron oversaw "a larger fleet inventory for [Canadian National] than … Borum did for [Illinois Central]."  (*Id.* at ¶4.)  In addition, Cameron "directly interacted regularly with the Edmonton-based contractor responsible for servicing the fleet in both Canada and the [United States]."  (*Id.*)  According to Zunti, "it was helpful to have a manager on-site in Edmonton to interact with the contractor, and … Cameron had a good working relationship with the contractor."  (*Id.*)  Therefore, Zunti decided that "it made more sense, operationally," for Cameron to assume Borum's duties, and having "Borum assume … Cameron's duties was not feasible."  (*Id.*)

Zunti conferred with McKelvie regarding his idea to eliminate Borum's position, and McKelvie agreed with Zunti's plan.  (*See* McKelvie Dep. at 25, Pg.

5

ID 289.)  McKelvie estimates that his opinion carried "maybe 20 percent of the weight" in the final decision.  (*Id.*)  Zunti then directed McKelvie to work with the Human Resources department to prepare for Cameron to take over Borum's position.  (McKelvie Dep. at 24, Pg. ID 288.)  Accordingly, McKelvie made arrangements for Cameron to travel to the Troy, Michigan, office in January 2012 to begin working with Borum's staff.  (*Id.* at 41, Pg. ID 293.)

## 2.    Borum is Told That Her Job is Being Eliminated

On or about January 10, 2012, McKelvie and Senior Manager of Human Resources Todd Taylor ("Taylor") met with Borum (the "January 10th Meeting").[1] (*See* Borum Dep. at 117, Pg. ID 258; McKelvie Dep. at 32, Pg. ID 290.)  McKelvie and Taylor informed Borum that her job was being elimated.  (*See* Borum Dep. at 117, Pg. ID 258; McKelvie Dep. at 32, Pg. ID 290.)  McKelvie told Borum that the elimination of her position "was not performance-based" and was motivated by  a need for "restructuring and change."  (McKelvie Dep. at 32, Pg. ID 290.)  Taylor explained to Borum that she had three options: she could (1) exercise her union seniority and return to a clerical position; (2) retire; or (3) assume "inactive

---

[1]   Some evidence in the record suggests that the January 10th Meeting actually occurred on January 12, 2012.  (*See, e.g.*, McKelvie Dep. at 27, Pg. ID 289; Borum Dep. at 116, Pg. ID 257.)  The precise date of the conversation is not material to the Court's decision on Defendants' Motion.

management status" for up to 60 days while seeking another management position within the company.  (McKelvie Dep. at 32-33, Pg. ID 290-91.  *See also* Borum Dep. at 118, Pg. ID 258.)  McKelvie told Borum that although she "could take some time to clean out [her] office" (*see* Borum Dep. at 122, pg. ID 259), the company "needed her decision as soon as possible for staff updating purposes." (McKelvie Dep. at 37, Pg. ID 292.)

During the January 10th Meeting, Borum asked McKelvie and Taylor whether the elimination of her position was consistent with promises that Grand Trunk made to her in the Settlement Agreement.  (*See* Borum Dep. at 117-118, Pg. ID 258.)  Taylor responded that he was "not aware of any settlement agreement," and he informed Borum that he "would look into her question."  (Taylor Decl. at ¶3.  *See also* Borum Dep. at 117-18, Pg. ID 258; McKelvie Dep. at 36, Pg. ID 291.)  Borum told Taylor that she "wanted to delay a decision [on the three options Taylor gave her] until [Taylor] had an opportunity to speak with the [company's] Law Department" about the Settlement Agreement.  (Borum Dep. at 118, Pg. ID 258.)  Accordingly, Borum did not tell McKelvie and Taylor which of the three options she preferred.

Following the January 10th Meeting, McKelvie informed the employees whom Borum supervised that Borum was no longer their manager and that they would now report to Cameron.  (*See* McKelvie Dep. at 38-39, Pg. ID 292.)

7

### 3. Borum Continues to Come to the Office While Her Job Status is in Limbo

Borum's employment status in the two or three days immediately following the January 10th Meeting is unclear. It is undisputed that Borum continued to come to the office each day. (*See* Borum Dep. at 122, Pg. ID 259; McKelvie Dep. at 43, Pg. ID 293.) It is also undisputed that Borum was paid for those days. (*See* Borum Dep. at 123, Pg. ID 259.) It appears that Borum spent this time – at least in part – packing up her belongings and clearing out her office. (*See* Borum Dep. at 122, Pg. ID 259; McKelvie Dep. at 43, Pg. ID 293.) However, the record is not clear about what else Borum did – and what her job status was – during the two or three days immediately after being told that her position was being eliminated.

According to McKelvie, Borum did not perform work in the days immediately following the January 10th Meeting:

> Q: As it relates to the time period from you notifying Ms. Borum that her position was being eliminated and two to three days later … [w]hat was her employment status?
>
> A: I believe – I don't know, but I think, it was – I don't know.
>
> Q: Was she working those two to three days?
>
> A: I recall that she was in the office.
>
> Q: My question was, was she working or was she there to pack up her things?
>
> A: I believe she was there to pack up her things.
>
> Q: So, she was not working those two to three days?

A:     Not to my recollection.

(McKelvie Dep. at 43, Pg. ID 293.)

According to Borum, she spent at least two days clearing out her desk:

Q:     That day of the job elimination, did you start clearing out your desk?

A:     I did.

Q:     And then the next day … what happened?

A:     … I just continued to clear out my office….

(Borum Dep. at 122, Pg. ID 259.)   Borum does not specify whether she did anything else besides clearing out her desk in the two or three workdays immediately following the January 10th Meeting.

### 4.    Two or Three Days After the January 10th Meeting, Borum Is Told That Her Job Will Not Be Eliminated

After the January 10th Meeting, Taylor located a copy of the Settlement Agreement.   (*See* Zunti Decl. at ¶6.)   Upon reviewing the document, Taylor informed Zunti that eliminating Borum's position might be inconsistent with the Settlement Agreement.   (*See* Taylor Decl. at ¶4.)   Thereafter, Zunti reversed his initial decision and determined not to eliminate Borum's position.   (*See* Zunti Decl. at ¶6.)

Accordingly, approximately "two or three days after" the January 10th Meeting, McKelvie told Borum that "the decision to abolish her job had been reversed and that [the department was] going back to status quo."   (McKelvie Dep.

9

at 42, Pg. ID 293.)   On or about the same day, McKelvie also met with the employees who reported to Borum and informed them that Borum would continue to be their supervisor.  (*Id.* at 45, Pg. ID 294.)

Thereafter, Borum continued to perform her regular job responsibilities. (*See* Borum Dep. at 123, Pg. ID 259.)  McKelvie contacted Cameron and directed her to cancel her plans to travel to Troy and instead return to Edmonton.  (*See* McKelvie Dep. at 40, Pg. ID 292.)  Borum concedes that at no time did Cameron actually perform Borum's job.  (*See* Borum Dep. at 198, Pg. ID 278.) In addition, Borum was unable to identify any specific problems that she experienced with her employees or colleagues as a result of the uncertainty surrounding her future with the company.  (*See, e.g.*, Borum Dep. at 122, Pg. ID 259.)

## PROCEDURAL HISTORY

On June 3, 2013, Borum filed the instant action in this Court.  (*See* Compl.) Borum's Complaint contains two counts, both under Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 *et seq.*  (*See id.*)  In the first count, Borum asserts that "the Defendants discriminated against [her] and harassed [her] by subjecting her to humiliation and discrimination to which other workers were not subjected, all because of her race."  (*Id.* at ¶26.)  Borum claims that "race was a factor that made a difference in Defendants' decision" to "abolish[] … [her] position."  (*Id.* at ¶¶22, 27.)  In the second count, Borum alleges that "Defendant

10

[sic] retaliated against [her] for having complained about Defendants' discriminatory employment practices … and for bringing a previous claim of discrimination." (*Id.* at ¶34.)  Borum argues that Defendants retaliated by terminating her employment because she brought the 1999 Lawsuit and sent the November 2011 email.

On April 11, 2014, Defendants moved for summary judgment. (*See* ECF #16.) The Court heard oral argument on Defendants' Motion on July 1, 2014. For the reasons discussed below, the Court now grants Defendants' Motion.

## GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252. Indeed, "[c]redibility determinations, the weighing of the

evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

**A.    Borum's Racial Discrimination Claim**

### 1.    Legal Standard Governing Race Discrimination Claims Under the ELCRA

The ELCRA provides that an employer shall not "discharge … or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of … race…."   M.C.L. § 37.2202(1)(a).   Claims under the ELCRA are analyzed using the same framework as claims under Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e.   *See Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n. 4 (6th Cir. 2003).

A plaintiff may rely on either direct or indirect evidence to establish a discrimination claim under the ELCRA.   *See Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).   Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor" in an adverse employment action.   *Jacklyn v. Shering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).   *See also Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (noting in the context of the Americans with Disabilities Act, which also borrows Title VII standards, that

12

direct evidence "would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled'").

A plaintiff who lacks direct evidence of discrimination may rely on indirect or circumstantial evidence. *See Laster*, 746 F.3d at 726. Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to establish a prima facie case of discrimination under the ELCRA, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the job and performed it satisfactorily; (3) despite her qualifications and performance, she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. *See Laster*, 746 F.3d at 727.

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employment decision." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012). If the defendant carries this burden, "the burden of production shifts back to the plaintiff to show that the legitimate reasons offered by the employer were not its true reasons, but rather were a pretext for unlawful discrimination." *Id.*

### 2.    Borum Has Cited No Direct Evidence of Discrimination

Borum has not presented any direct evidence of racial discrimination.  *See, e.g., Chrysler*, 155 F.3d at 805 ("I fired you because you are disabled"). Accordingly, the Court will consider whether Borum has presented sufficient indirect or circumstantial evidence to establish a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework.   For the reasons discussed below, the Court concludes that she has not.

### 3.    Borum Has Not Established a Prima Facie Case of Discrimination

In applying the *McDonnell Douglas* framework, this Court must "first determine[] if [Borum] has put forth sufficient evidence for a reasonable jury to find her to have met the prima facie requirements."  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).  Defendants do not contest that Borum satisfies the first two prima facie requirements – membership in a protected class and satisfactory job performance.  Rather, Defendants assert that Borum has not presented evidence sufficient to carry her burden on the third and fourth requirements – she has not shown that she suffered an adverse employment action or that she was treated less favorably than a similarly situated individual outside of her protected class.

14

### a.   Borum Did Not Suffer an Adverse Employment Action

An adverse employment action is a "materially adverse change in the terms or conditions of employment." *Laster*, 746 F.3d at 727 (quoting *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). More specifically, such an action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). It "requires an official act of the … company," and "in most cases [it] is documented in official company records." *Id.* (quoting *Burlington Indus.*, 524 U.S. at 762). Importantly, an adverse employment action "typically 'inflicts direct economic harm.'" *Id.*

Borum claims that she suffered an adverse employment action when "she was terminated from her employment." (*See* Borum's Resp. Br. at 8, Pg. ID 218.) But she was *not* terminated – Borum was *told* that her position was being eliminated, *but Illinois Central never actually terminated her employment*.

The undisputed facts are as follows: (1) at the January 10th Meeting, Borum was told that her position was being eliminated; (2) Borum objected on the basis that the Settlement Agreement protected her job; (3) Borum continued to attend work, and continued to be paid, while Taylor located the Settlement Agreement; and (4) two or three days later, McKelvie told Borum that her job would not be

eliminated.  These facts – even taken in the light most favorable to Borum – do not establish that she was terminated.

Borum has not cited any case law holding that merely being *told* that one's position is being eliminated – as opposed to it actually *being* eliminated – is "a materially adverse change in the terms or conditions of employment." *Laster*, 746 F.3d at 727.[2]  Similarly, she has cited no authority to support the proposition that her two-or-three day "limbo" period amounted to an adverse employment action. And it makes sense that Borum has cited no such authority – because these alleged

---

[2]  Borum cites *Coley v. Consolidated Rail Corp.*, 561 F.Supp. 645, 649 (E.D. Mich. 1982) for the proposition that her "state of psychological well-being is a term, condition, or privilege of employment."  Presumably, Borum is implying that being told that her position would be eliminated is itself an adverse employment action if it affected her "state of psychological well-being."  But there is simply no binding precedent that would require this conclusion, and the Court declines to follow *Coley* on this score.  *Coley* was an early Title VII sexual harassment case, and the district court required a finding that the alleged harassment affected a "term, condition, or privilege of employment" – *not* that the employer had taken an "adverse employment action" against the plaintiff.  *Id.* at 649.  Borum also cites *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) – presumably in support of her position that harm to her "state of psychological well-being" is an adverse employment action.  But *Harris* is inapposite to Borum's race discrimination claim.  The plaintiff in *Harris* did not bring a claim for discrimination, but rather a claim for "abusive work environment" harassment.  510 U.S. at 19.  The Supreme Court's holding in *Harris* – that a plaintiff need not show that her work environment is "psychologically injurious" in order to sustain a claim of "hostile work environment" harassment, *see* 510 U.S. at 22 – is not relevant to the issue of whether Borum suffered an adverse employment action for purposes of her race discrimination claim.

harms fall short of actions that are *actually* materially adverse, such as a termination, demotion, or failure to promote. *See id.*

Further, as noted above, an adverse employment action "typically inflicts direct economic harm," *id.* (internal citation omitted), but in this case, Borum has not shown that she suffered any economic harm. To the contrary, she has testified that she did not lose any pay. (*See* Borum Dep. at 123, Pg. ID 259.) Moreover, "in most cases [an adverse employment action] is documented in official company records." *Laster*, 746 F.3d at 727 (internal citation omitted). But after lengthy discovery, Borum has not cited any official company records indicating that her employment and/or benefits were terminated. Simply put, the harms that Borum alleges are not cognizable adverse employment actions under the law.

Even if the Court were to assume, as Borum argues, that she was terminated at the January 10th Meeting, her termination would not constitute an adverse employment action because Illinois Central quickly reversed the termination. "[W]hen an otherwise adverse employment action is rescinded before the employee suffers a tangible harm, the employee has not suffered an adverse employment action." *Keeton v. Flying J, Inc.*, 429 F.3d 259, 263 (6th Cir. 2005) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001)). *See also Birch v. Cuyahoga County Probate Court*, 392 F.3d 151 (6th Cir. 2004). In this case, the alleged job termination lasted – at most – two or three days, and

17

Borum has not alleged that she suffered any tangible harm during that time. Indeed, she did not lose any pay, and she was unable to identify any specific problems that she experienced with her employees or colleagues as a result of the alleged termination.

If Borum had been terminated, this case would resemble *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir 2000).   In that case, Bowman was demoted after alleging that his supervisor sexually harassed him, but he was restored to his original position ten days later.   220 F.3d at 459-60.   The Sixth Circuit held that "[e]ven if we assume that the [demotion] constitutes a significant change in employment status, there is no tangible employment action in this case because the very temporary nature of the employment action in question makes it a non-materially adverse employment action."   *Id.* at 462.   Borum's alleged termination was significantly shorter than Bowman's demotion, and she has not alleged that she suffered any tangible harm as a result.   Accordingly, she has failed to demonstrate that she suffered an adverse employment action.

> **b.   Borum Was Not Replaced By, Or Treated Less Favorably Than, Any Similarly-Situated Individual Outside of Her Protected Class**

Even if Borum did experience an adverse employment action (and she did not), she nonetheless has failed to establish a prima facie case of discrimination because she has not shown that she was replaced by, or treated less favorably than,

18

a similarly-situated individual outside of her protected class. Borum's claim appears to be that she was replaced by Cameron, who is white. (*See* Borum's Resp. Br. at 11, Pg. ID 221.) Borum was not replaced by Cameron because – as discussed above – Borum was never terminated from her position. Moreover, Borum herself acknowledged that Cameron never "actually perform[ed] [Borum's] position." (Borum Dep. at 198, Pg. ID 278.)

Borum has also failed to establish that she and Cameron were "similarly situated." Individuals are similarly situated if they are "similar in all relevant respects." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 748-52 (6th Cir. 2012). Borum was not similar to Cameron in one key respect: Cameron had a "good working relationship" with the Edmonton-based contractor she supervised (Zunti Decl. at ¶3), but Borum had no interactions with the contractor (*see* McKelvie Dep. at 46-47, Pg. ID 294). This distinction mattered. Indeed, Zunti thought that Cameron's relationship with the Edmonton-based contractor was "helpful" to the company, and he felt that further developing that existing relationship was an "important component" of Cameron's job. (Zunti Decl. at ¶¶3-4.) Moreover, because Borum did not have any relationship with the contractor, Zunti felt that it was "not feasible" for Borum to perform Cameron's job. (*Id.* at ¶4.) Accordingly, Borum has failed to show that she and Cameron were similarly situated, and she has therefore failed to present a prima facie case of discrimination.

19

**4.    Defendants Are Entitled to Summary Judgment on Borum's Other Allegations of Discrimination**

Borum's Complaint identified only the alleged termination of her employment as the basis for her race discrimination claim. (*See* Compl. at ¶¶10-22.)  In response to Defendants' Motion, however, Borum cited a number of other incidents during her employment at Illinois Central, and she now appears to allege that these incidents constituted unlawful racial discrimination. (*See* Borum's Resp. Br. at 3-4, Pg. ID 213-14.)   Because Borum's Complaint was limited to the termination of her employment and did not suggest that there was any other basis for her race discrimination claim, she is not permitted to raise these new theories of discrimination in response to Defendants' Motion.  *See, e.g., Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent [plaintiff] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment…").   Accordingly, Defendants are entitled to summary judgment on Borum's racial discrimination claim under any of the alternative theories she raised in response to Defendants' Motion.[3]

_____

[3]  Borum's Complaint arguably contains a separate claim of harassment under the ELCRA. (*See* Compl. at 4-5, Pg. ID 4-5 (labeling Borum's first count "Race Discrimination/Harassment" and alleging that Defendants "harassed [Borum] by subjecting her to humiliation and discrimination").)  However, nothing else in the record indicates that Borum intended to maintain a separate claim of harassment. Indeed, Borum has not pressed a separate claim of harassment in response to Defendant's Motion – she did not mention a harassment claim in her response

In any event, even if the Court did interpret the Complaint to include these alternative theories (and it does not), the new theories would still fail for at least the following reasons:

- Borum asserts that she has been discriminated against because her pay grade previously had been comparable to the pay grade for Risk Managers, but her pay grade is now lower than the pay grade for Risk Managers. (*See* Borum's Resp. Br. at 3, Pg. ID 213; Borum Dep. at 176, Pg. ID 272.) The only evidence that Borum presents for this claim is that she accessed Illinois Central's computer system and determined that she now has a lower pay grade than a Risk Manager named Hugh Freeman ("Freeman"). (*See* Borum Dep. at 176, Pg. ID 272.) Borum has failed to present a prima facie case of discrimination with respect to this claim because, among other reasons, there is no evidence in the record of Freeman's race. Therefore, Borum has not shown that she was treated differently than a similarly-situated person outside of her protected class.

- Borum argues that she "has been denied the assistance of additional support staff," while Cameron has been granted

---

brief, nor did she raise it at oral argument. Accordingly, to the extent that the Complaint does contain a separate claim of harassment, the Court deems Borum to have waived the claim. *See McCann v. U.S. Bank, N.A.*, 873 F.Supp.2d 823, 847 (E.D. Mich. 2012) (citing *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005)).

Even if the Court were to reach the merits of Borum's harassment claim, Defendants would still be entitled to summary judgment. Although Borum identified a few instances of racially-offensive comments in her deposition, such comments were not "severe or pervasive," as required to sustain a "hostile work environment" harassment claim. *See Cleveland v. Southern Disposal Waste Connections*, 491 Fed. App'x. 698, 708 (6th Cir. 2012) ("offhand comments [and] isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

additional support. (Borum Resp. Br. at 3, Pg. ID 213.) But Borum has failed to present a prima facie case of discrimination with respect to this claim because, as described above, Borum has not presented evidence that Cameron is similarly-situated in all relevant respects. *See Bobo*, 665 F.3d 741 at 748-52. In fact, Borum's own deposition testimony suggests that Cameron is *not* similarly-situated in one crucial respect: her workload. Borum testified that her "counterparts in Canada" – which presumably include Cameron – do "a third more work" than she does. (Borum Dep. at 26, Pg. ID 235.)[4] Because Borum's own testimony indicates that she and Cameron are not similarly-situated with respect to their workloads, her prima facie case of discrimination based on divergent staffing levels fails.

- Borum claims that she has been "require[d] … to engage in significantly more travel" because certain employees whom she supervises were moved from Troy to Harvey, Illinois. (Borum Resp. Br. at 3, Pg. ID 213. *See also* Borum Dep. at 44, Pg. ID 239.) Borum has failed to present a prima facie case of discrimination with respect to this claim because, among other things, Borum has not cited any evidence that a similarly-situated individual outside of her protected class was treated more favorably.

- Borum asserts that in 2011 McKelvie did not permit Borum to roll over one day of vacation to the following year, even though other employees were permitted to roll over vacation days. (*See* Borum Dep. at 48, Pg. ID 240.) Borum has failed to present a prima facie case of discrimination with respect to this claim, as she has cited no authority for the proposition that the denial of permission to roll over one vacation day constitutes an adverse employment action. Indeed, denying permission to roll over one vacation day is hardly "a significant change in employment status." *Laster*, 746 F.3d at 727. Moreover, even if it were an adverse employment action, Borum has offered no evidence that the employees who were

---

[4] This conclusion is corroborated by Zunti, who stated that "Cameron handled a larger fleet inventory" than Borum. (Zunti Decl. at ¶4.)

permitted to roll over vacation days are outside of her protected class.

- Borum alleges that "her work was more heavily scrutinized" after she signed the Settlement Agreement. (*See* Borum's Resp. Br. at 4, Pg. ID 214.) The sole basis for this allegation appears to be Borum's belief that McKelvie told Cameron to "watch for anything strange that came out of [Borum's] department and report it to him." (Borum Dep. at 68, Pg. ID 245.) This allegation hardly demonstrates that Borum was subjected to increased scrutiny and, even if it did, increased scrutiny of an employee's work is "not tantamount to [an] adverse employment action[]." *Birch*, 392 F.3d at 169 (citing *Allen v. Mich. Dep't of Corrections*, 165 F.3d 405, 410 (6th Cir. 1999)). Accordingly, Borum has failed to present a prima facie case of discrimination with respect to this claim.

## B.   Borum's Retaliation Claim

### 1.   Legal Standard Governing Retaliation Claims Under the ELCRA

The ELCRA provides that an employer shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." M.C.L. § 37.2701(a). Like race discrimination claims, retaliation claims under the ELCRA are evaluated using the *McDonnell Douglas* burden-shifting framework. *See Laster*, 746 F.3d at 730. To establish a prima facie case of retaliation, plaintiff must demonstrate that: (1) she engaged in protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between

23

the protected activity and the materially adverse action.  *See id.* (quoting *Jones v.
Johanns*, 264 Fed. App'x. 463, 466 (6th Cir. 2007)).

### 2.      Borum Has Not Established a Prima Facie Case of Retaliation

Borum has identified two instances in which she engaged in protected
activity – the 1999 Lawsuit and the November 2011 Email.  (*See* Compl. at ¶34.)
But, as discussed below, Borum has failed to present a prima facie case that
Defendants retaliated against her based upon either activity.

### a.      Borum Has Failed to Demonstrate that the November 2011 Email Led to Retaliation

In order to establish the defendant's-knowledge element of her prima facie
case, Borum must show that "her protected activity was known *to those who made
th[e] decision*" to terminate her employment.  *Fenton v. HiSAN, Inc.*, 174 F.3d
827, 832 (6th Cir. 1999) (emphasis added).  *See also Mullhall v. Ashcroft*, 287 F.3d
543, 554 (6th Cir. 2002).   It is not enough to show that *someone* within the
company was aware of her protected activity.  She has failed to make the required
showing of knowledge with respect to the November 2011 Email.

Zunti and – to a lesser extent – McKelvie appear to have been the relevant
decision makers who determined to eliminate Borum's position.  (Zunti Decl. at
¶¶3-4; McKelvie Dep. at 25, Pg. ID 289.)  Defendants have presented evidence that
neither Zunti nor McKelvie knew about the November 2011 Email prior to making
the decision to eliminate her position.  (*See* Zunti Decl. at ¶7; McKelvie Dep. at 22,

Pg. ID 288.)   Borum has not countered with any evidence that either Zunti or McKelvie was aware of the November 2011 Email.[5]   Accordingly, Borum has failed to satisfy the defendant's-knowledge prong of her prima facie case.

Borum counters that she may establish the requisite knowledge by showing that the "employer" – not any particular employee – knew about the plaintiff's protected activity.   Borum states that individuals in the Human Resources department knew about the November 2011 Email, and she insists that their knowledge satisfies the Defendant's-knowledge prong of her prima facie case.   But this argument directly contradicts controlling Sixth Circuit decisions such as *Fenton, supra*.   In that case, a factory shift worker complained about sexual harassment to two management officials, including the plant superintendent, and the worker was subsequently transferred by her supervisor and team leader to a less desirable shift.   *Fenton*, 174 F.3d at 832.   The supervisor and team leader did not know about the worker's complaints at the time they decided to transfer the worker.   The Sixth Circuit affirmed summary judgment against the worker on her Title VII retaliation claim because she had not shown that "her protected activity was known *to those who made th[e] decision*" to transfer her.   *Id.* (emphasis

---

[5]   In her deposition, Borum initially asserted that she "believe[d]" that McKelvie was aware of the November 2011 Email prior to the January 10th Meeting, but she later admitted that she did not have any evidence that McKelvie knew about the November 2011 Email.   (*See* Borum Dep. at 80, Pg. ID 248.)

added).    Accordingly, Borum has not established the defendant's-knowledge element of a prima facie case because she has not demonstrated that Zunti or McKelvie knew about the November 2011 Email.

> **b.    Borum Has Failed to Establish That the 1999 Lawsuit Led to Retaliation**

Borum has not established a prima facie case of retaliation based on the 1999 Lawsuit because she has not shown that there is any causal connection between that protected activity and her alleged job termination.  "[N]o one factor is dispositive in establishing a causal connection."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  However, causal connection may be inferred from (1) evidence that Defendants "treated [Borum] differently from similarly situated employees" or (2) "that the adverse action was taken shortly after [Borum's] exercise of protected rights."  *Id*.  Borum has not demonstrated a causal connection between the alleged job termination and the 1999 Lawsuit through either type of evidence.

Borum has not presented evidence that Defendants treated her any differently than a similarly-situated employee.  Indeed, Cameron and Freeman are the only employees whom Borum specifically alleges have received more favorable treatment.  But, as discussed above, Borum has not presented evidence that she is similarly situated in all relevant respects to either Cameron or Freeman.

26

Nor has Borum established a causal connection based on temporal proximity. Roughly twelve years elapsed between the 1999 Lawsuit and the alleged termination of Borum's position. During those many years, Borum worked for Illinois Central and its predecessors without being subjected to any disciplinary proceedings or materially adverse employment actions. (*See* Borum Dep. at 138, Pg. ID 263.) On this record, there is simply no basis on which to conclude that in 2011 or 2012 the Defendants retaliated against Borum for her filing of the 1999 Lawsuit.

Further, the Sixth Circuit has held that, in the absence of other indicia of retaliation, lapses of time significantly shorter than 12 years break the causal connection between protected activity and a materially adverse action. *See, e.g., Nicholson v. City of Clarksville, Tenn.*, 530 Fed. App'x 434, 448 (6th Cir. 2013) ("A time period greater than six months, without more, is not a sufficiently short period of time to satisfy the causal connection element of a retaliation claim"). *See also Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 718 (6th Cir. 2007) (finding no causal connection where six months lapsed between protected activity and an adverse employment action). Even if Borum had presented other indicia of retaliation (and she has not), Borum has cited no case in which any court has found there to be a causal connection when protected activity occurred 12 years prior to

27

an adverse action.  The lapse of time between the 1999 Lawsuit and the alleged job termination is simply too long for this Court to infer any sort of causal connection.

## **CONCLUSION**

For all of the reasons stated in this Opinion and Order, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (ECF #16) is **GRANTED.**

                                    s/Matthew F. Leitman
                                    MATTHEW F. LEITMAN
                                    UNITED STATES DISTRICT JUDGE

Dated:  August 5, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 5, 2014, by electronic means and/or ordinary mail.

                                    s/Holly A. Monda
                                    Case Manager
                                    (313) 234-5113

28